## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **VANESSA THOMAS** | **CIVIL ACTION** |
| **VERSUS** | **NO: 07-7422-MLCF-SS** |
| **MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY** | |

## REPORT AND RECOMMENDATION

The plaintiff, Vanessa Thomas ("Thomas"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423, and her claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382(a)(3).

## PROCEDURAL HISTORY

On August 2, 2004, Thomas filed applications for benefits. R. 61-65, and 388-95. She alleged she became disabled on September 1, 2003, due to sleep apnea, coronary heart disease, diabetes, obesity, and high blood pressure. R. 65. Her applications were denied. R. 40-46A. On April 12, 2007, a hearing was held before an ALJ. R. 400-23. At her request, the onset date was amended from September 1, 2003 to May 26, 2004. R. 404. On May 11, 2007, the ALJ denied her applications. R. 12-23. On August 24, 2007, the Appeals Council denied her request for review. R. 4-6. On October 26, 2007, she filed a complaint for review with this Court. Rec. doc. 1. The parties submitted briefs. Rec. docs. 9 and 10. Thomas is represented by counsel in this Court.

# STATEMENT OF ISSUES ON APPEAL

1. Did the ALJ err in failing to accord proper weight to Dr. Ellis' opinion?

2. Was the ALJ's residual functional capacity assessment based on substantial evidence?

# THE COMMISSIONER'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issues on appeal:

1. Thomas met the insured status requirements of the Social Security Act through December 31, 2008.

2. Thomas has not engaged in substantial gainful activity since May 26, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. Thomas has the following severe impairments: morbid obesity, hypertension, diabetes mellitus, sleep apnea, and major depression (20 CFR 404. 1520(c) and 416.920(c)).

4. Thomas does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)), 404.1526, 416.920(d), 416.925 and 416.926).

5. Thomas had the residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk 2 hours out of 8, sit 6 hours out of 8 with normal breaks, restrict from balancing activities, unprotected heights, dangerous moving machinery, climbing ladders, scaffolds, and ropes. She must have a clean working environment, free from dust, fumes, odors, gases and poor ventilation. She was capable of understanding, remembering, and carrying out detailed but not highly complex decisions. She could attend and concentrate for extended periods and deal appropriately with routine work changes, peers and bosses.

6. Thomas is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. On the alleged disability onset date, Thomas was 44 years old which is defined as a younger individual age 18-49 (20 CFR 404.1563 and 416.963).

8. Thomas has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering Thomas' age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Thomas can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. Thomas was not under a disability, as defined in the Social Security Act, from May 26, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

R. 17-22.

## ANALYSIS

a. **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000); Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Newton, 209 F.3d at 452. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's. Id.; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Villa, 895 F.2d at 1022; Johnson v. Bowen, 864

F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Newton v. Apfel, 209 F.3d at 453; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Leggett v.

---

[1] The five-step analysis requires consideration of the following:
First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).
Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).
Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).
Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).
Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

4

Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry. Id. If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989). When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant." Id.; accord Selders, 914 F.2d at 618.

The Court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history." Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995). "The Commissioner, rather than the courts, must resolve conflicts in the evidence." Id.

b.   **Testimony before the ALJ**.

At the time of the hearing Thomas was 47. R. 405. She had finished the twelfth grade. R. 405. She attended, but did not complete, a course in welding at a vocational school. R. 405. She stopped because her father died. R. 405.

In 2004, Thomas worked about five months at a Family Dollar store. She stopped because she could not do the physical work. R. 406. Prior to 2004, she worked at K-Mart for 19 years as an electronics manager. R. 406-07. Her unemployment benefits expired in 2004. R. 407. When she applied for benefits, she reported she could work as a cashier. R. 408.

Thomas suffered from sleep apnea, but could not afford the machine to help her sleep. R. 408. She had diabetes and took insulin. R. 409. These conditions made her tired. R. 410. She had

5

arthritis in her legs. R. 410. She was not able to loose weight. R. 411. She went to a mental health clinic for depression. R. 411. She reported that the medication from the clinic helped her to rest. R. 412.

Thomas lived with her 17 year old daughter. R. 412. She became short winded when she did housework. R. 413. Sometimes she needed help bathing. R. 413. During the day she slept in a recliner. R. 413. She tried to walk for exercise, but could not do it because she tried to answer the phone at her church as a volunteer, but could not do it. She kept going to sleep. R. 414.

Based on the ALJ's hypothetical, the vocational expert testified that Thomas could not perform her past relevant work but could do sedentary work as a cashier or receptionist. R. 415-19. If Thomas suffered from a marked impairment in her ability to tolerate customary work pressures, it would not help her ability to maintain employment. R. 422-23.

c. **Medical Evidence**.

On July 28, 2002, Thomas went to the emergency room at River Parishes Hospital with complaints of chest discomfort. R. 165-67. On September 11, 2002, she was seen at the cardiac department of the Medical Center of Louisiana at New Orleans ("Charity Hospital"). Her diet was modified, and medication was prescribed. R. 248. On September 19, 2002, she went to the emergency room at River Parishes Hospital reporting chest pain. R. 162-64. On October 8, 2002, she underwent a stress test at Charity Hospital. The results were negative. Rec. doc. 137-55. An imaging report revealed a small defect consistent with a myocardial infarction in the inferior wall. R. 203. On October 24, 2002, she was seen at Charity Hospital for a cardiac appointment. R. 243. On December 27, 2002, she went to the emergency room at River Parishes Hospital complaining of increased thirst, urination and blurred vision. R. 156-161.

6

On December 30, 2002, Thomas was seen for a follow-up visit at the Edgar Primary Care facility for her diabetes. R. 188. Lab work had been done. R. 192. She was maintained on a diet. R. 188. On January 6, 2003, she returned to Edgar Primary Care for her diabetes. R. 187. On January 30, 2003, she was seen at Charity Hospital for a cardiac appointment. There was no indication for a cardiac catheterization. Thomas was walking two miles a day. R. 186. On February 17, 2003, she returned to Edgar Primary Care for her diabetes. R. 185. On April 5, 2003, she was seen at Charity Hospital with complaints of edema and swelling and chest pains. She was told to return in a month. R. 183.

On May 12, 2003, she went to Edgar Primary Care for her diabetes. R. 185. On June 5, 2003, she was seen at Charity Hospital for a cardiac appointment. Medication was prescribed. She was to return in a month. R. 240. A July 17, 2003, cardiac echogram revealed a good left ventricular function. R. 182. On July 31, 2003, she was seen at Charity Hospital and reported edema, swelling and some chest pain. R. 180. On August 13, 2003, she returned to Edgar Primary Care for her diabetes. R. 288. On November 6, 2003, she returned to Charity Hospital for a routine cardiac visit. R. 177. On December 10, 2003, she returned to Edgar Primary Care for her diabetes. R. 287.

On February 19, 2004, Thomas was seen by Dr. Velva Boles, M.D. an internist, at Edgar Primary Care for a follow-up visit. Medication was prescribed for her obesity. Her hypertension was described as controlled. R. 175. On March 24, 2004, she returned to Dr. Boles. Medication was prescribed for her low energy and obesity. R. 174. On April 7, 2004, she returned to Dr. Boles with complaints of pain in her left leg and right arm. R. 173. On May 4, 2004, she was seen by Dr. Boles for severe pain in right arm after a fall. R. 172. On July 27, 2004, she reported to Dr. Boles

7

that she wanted to lose weight. Her medication was increased. R. 170.

On July 27, 2004, Dr. Boles reported that Thomas had insulin-dependent diabetes, hypothyroidism, congestive heart failure, degenerative joint disease, spinal arthritis and a myocardial infarction in 2002. Dr. Boles reported that Thomas was the primary care-taker for her brother who was incompetent. Dr. Boles described her as morbidly obese (five feet six inches tall and 344 pounds) and gravely depressed. Dr. Boles indicated that exercising was difficult and placed her at increased risk of a second heart attack. Dr. Boles concluded that Thomas was unable to maintain gainful employment because of her medical conditions. R. 168.

On October 11, 2004, Thomas was seen by Gary Carroll, M.D., an internist, for a consultative examination. At the physical exam she weighed 377 pounds. She ambulated without a limp or cane. Her blood pressure was 130/80, and the rest of the cardiovascular exam was unremarkable. Her chest and lungs were normal. Her range of motion, squats and knee bends were limited by her obesity. The neurological exam was normal. The remainder of the physical exam was unremarkable. R. 205-10.

On December 6, 2004 and February 14, 2005, Thomas was seen at Charity Hospital for complaints of daytime fatigue. R. 230-31. A sleep study was ordered. R. 233. On March 9, 2005, she was diagnosed with severe obstructive sleep apnea syndrome. Because of the condition, she was instructed to avoid driving and operating heavy machinery. R. 216-17. On March 24, 2005, she was seen at Charity Hospital. A stress echo cardiogram was ordered. She was to return in two to three months. She was instructed to exercise, and her medication was changed. R. 221-22. On April 18, 2005, she was seen at Charity Hospital for a follow-up visit for sleep apnea. R. 219-20.

On April 18, 2005, Blesilda Quiniones-Ellis, M.D., a Charity Hospital physician,[2] reported that Thomas was not able to work due to her medical condition. R. 250.

On July 27, 2005, Thomas was seen by Steven S. McPherson, M.D.[3] Dr. McPherson found that she suffered from sleep apnea and morbid obesity, and noted that she had some difficulty ambulating and getting on and off the examining table. Her condition did not impair her ability to sit or lift objects. Her ability to stand for prolonged periods of time or walk beyond short distances was significantly impaired. R. 251-53. On August 10, 2005, a non-examining consulting psychologist, Charlotte Ducote, Ph.D., completed a psychiatric review technique form. Ducote found: Thomas' impairment was not severe. She had no limitations except for restrictions of activities on daily living which were mild. R. 255-68. On August 10, 2005, a non-examining consulting physician, Anthony M. Scardino, M.D.,[4] completed a physical residual functional capacity assessment. He concluded she could do light work with restrictions. R. 269-76.

On April 5, 2006, Thomas was evaluated at the River Parishes Mental Health Clinic ("River Parishes") by Dr. Robert Ellis, a psychiatrist. She reported that she was depressed and crying all the time. Zoloft was prescribed. R. 297, 302-304. On October 2, 2006, she was seen by Dr. Ellis and Haldol was prescribed. R. 299. On December 7, 2006, she reported to the nurse that her medications were working well and she was taking care of her ill brother. R. 305.

On January 3, 2007, Thomas reported to the River Parishes nurse that she was depressed over her medical problems. R. 306. On February 13, 2007, she reported to the River Parishes nurse that

---

[2] Dr. Quiniones-Ellis' speciality is not identified.

[3] Dr. McPherson's speciality is not identified. It appears that Thomas was seen by Dr. McPherson for a consultative examination.

[4] Dr. Scardino's speciality is not identified.

9

she was having no functioning difficulties. R. 307. On March 14, 2007, she went to River Parishes for a refill of her medications. The nurse noted that Thomas was pleasant, talkative and cooperative. Thomas reported no adverse effects from the medication, her sleep and appetite had increased. She reported no homicidal/suicidal ideations and no audio/visual hallucinations. R. 307. On April 2, 2007, she was by Dr. Ellis. R. 307. On April 11, 2007, Dr. Ellis completed a "Mental Residual Functional Capacity Questionnaire" in which he concluded that Thomas had a marked limitation in her ability to tolerate customary work pressure. R. 293-296.

From September 2, 2004 through March 9, 2007, Thomas was seen regularly at Teche Action Clinic. R. 349-372. On September 20, 2006, exercise and diet restrictions were prescribed. R. 341. On October 23, 2006, Thomas was referred to an orthopedic clinic. R. 340.

d. **Plaintiff's Appeal.**

Issue no. 1.    Did the ALJ err in failing to accord proper weight to Dr. Ellis' opinion?

In <u>Newton v. Apfel</u>, 209 F. 3d 448 (5th Cir. 2000), the Fifth Circuit said,

> The Court concludes that, absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2).

<u>Id</u>. at 453. These regulations require consideration of the following:

(1) the physician's length of treatment of the claimant,

(2) the physician's frequency of examination,

(3) the nature and extent of the treatment relationship,

(4) the support of the physician's opinion afforded by the medical evidence,

(5) the consistency of the opinion with the record as a whole; and

(6) the specialization of the treating physician.

20 C.F.R. § 404.1527(d)(2), and see SSR 96-2p, 1996 WL 362211.

The only psychiatrist to see Thomas was Dr. Ellis at River Parishes Mental Health Clinic. Thomas began seeking Dr. Ellis on April 5, 2006. R. 297, 302-304.[5] She returned to this clinic regularly for medication. R. 297-302. A year after the initial visit, Dr. Ellis completed a Residual Functional Capacity Questionnaire, in which he concluded Thomas had a marked limitation in the ability to tolerate customary work pressure. R. 293-96. The ALJ, however, concluded that Thomas was able to perform the requirements for unskilled sedentary occupations including that of a cashier. R. 22.

Thomas urges that the ALJ failed to give appropriate weight to the opinion of Dr. Ellis, adopted the opinion of the non-examining consulting psychologist, Dr. Ducote, and did not perform the analysis of the six factors found in 20 C.F.R. § 404.1527(d)(2). The Commissioner disputes these conclusions.

The ALJ said:

[T]he record shows the claimant recently began treatment for depression. A Mental Residual Functional Capacity Questionnaire indicates the claimant has major depression with psychotic features and GAF of 40-45 (R. 293-96). Also, indicated is [sic] moderate limitations with social interaction, concentration and persistence, and in the ability to adapt. Progress notes show the claimant reported the medications are working well as she denied any side effects or any other problems. She also verbalized no apparent functioning difficulties. Based on the record as a whole, including hearing testimony, the undersigned finds she has only mild restrictions of activities of daily living, no restriction in maintaining social functioning, no restriction with concentration, persistence, or pace and no episodes of decompensation. The undesigned has considered the claimant's limitations as well as any difficulties and incorporated them into the residual functional capacity which further reduces it.

---

[5] The records of Thomas' treatment by Dr. Ellis and the Clinic are found at R. 293-307.

Rec. doc. 21.

In the circumstances of this case, <u>Newton</u> requires that the ALJ consider the six factors. It does not require that the ALJ enumerate the six factors and cite the regulation. That would place form over substance. The ALJ noted that Thomas recently began treatment for depression and was diagnosed with major depression. The decision is dated May 11, 2007, and Thomas' first contact with Dr. Ellis was on April 5, 2006. The ALJ considered the first factor (the physician's length of treatment of the claimant) and the sixth factor (the specialization of the treating physician).

The ALJ referred to the evaluation, progress notes and RFC questionnaire. R. 21. The record demonstrates that Thomas was seen by Dr. Ellis on April 5, 2006 for a psychiatric evaluation. R. 302-04. Dr. Ellis saw her on January 3, 2007 and April 2, 2007. R. 306-07. Dr. Ellis completed the questionnaire on April 11, 2007. R. 296. She was seen by RNs at River Parishes on November 6, 2006, December 7, 2006, January 19, 2007, February 13, 2007 and March 14, 2007. R. 305-07. There were other contacts for refills of medication. R. 297-301. In referring to the initial evaluation, progress notes and questionnaire, the record demonstrates that the ALJ considered the second factor (physician's frequency of examination) and the third factor (nature and extent of the treatment relationship).

While noting the limitations found in the questionnaire, the ALJ referred to what was reported in the progress notes and concluded that, based on the record as a whole, she had only mild restrictions. This demonstrates that the ALJ considered the fourth factor (the support of Dr. Ellis' opinion afforded by the medical evidence of record) and the fifth factor (the consistency of Dr. Ellis' opinion with the record as a whole).

The ALJ complied with the requirements of <u>Newton</u>, when he did not accept Dr. Ellis'

12

determination that Thomas had a marked limitation in the ability to tolerate customary work pressure.

Issue no. 2.    Was the ALJ's residual functional capacity assessment based on substantial evidence?

Thomas contends that the medical evidence demonstrates that she does not have the residual functional capacity ("RFC") assigned by the ALJ. She cites Dr. Ellis' questionnaire responses that she had a marked impairment in her ability to tolerate customary work pressures and moderate impairments in her ability to perform other work related activities.

The ALJ's hypothetical question included physical limitations. R. 415-16. It also provided that:

> [S]he was capable of understanding, remembering and carrying out detailed but not highly complex type of decisions. She could attend and concentrate for extended periods and deal appropriately with the routine work changes, peers and bosses.

R. 415-16. With these limitations, the expert responded that Thomas could not perform her past relevant work but she could do sedentary work such as cashier. R. 418. The ALJ presented the expert with the RFC questionnaire completed by Dr. Ellis. The expert testified that the moderate limitations would not preclude Thomas from any type of work. R. 421-22. The expert testified that Thomas would have to show up for work and concentrate on the job and that the marked limitation would not help her maintain employment. R. 421-22.

The issue is whether there is substantial evidence to support the RFC described by the hypothetical question. Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Newton, 209 F.3d at 452. The following present substantial evidence to support the ALJ's determination of Thomas' ability perform sedentary work: (1) her positive response to the

13

medication for depression (R. 307); (2) the psychiatric review technique form completed by Dr. Ducote on August 10, 2005 (R. 255-268); (3) the reports in the medical records of her care for her brother (R. 169 and 305); and (4) the circumstances supporting the ALJ's finding that her testimony was not fully credible (R. 21). Thomas' contention that the medical evidence reveals that she does not possess the assigned RFC is based on the questionnaire completed by Dr. Ellis. As demonstrated above, the ALJ properly evaluated Dr. Ellis' opinion. Thomas' argument amounts to a request that the undersigned re-weigh the evidence. This is not permitted. Selders, 914 F.2d at 617.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that the plaintiff's claims for relief (Rec. docs. 1 and 9) be DENIED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 26th day of January, 2009.

_____
**SALLY SHUSHAN**
**United States Magistrate Judge**